UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:22-cv-00041-FDW-DCK

| | | |
|---|---|---|
| MARY A. KUMAGAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| ALDERSGATE UNITED METHODIST | ) | |
| RETIREMENT COMMUNITY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 15). The motion has been fully briefed and is now ripe for review. For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment.

## I.    BACKGROUND[1]

Plaintiff Mary Kumagah ("**Plaintiff**") filed this action asserting violations of the Americans with Disabilities Act ("**ADA**" or "**the Act**") arising out of her employment at Defendant Aldersgate United Methodist Retirement Community, Inc.'s ("**Defendant**") retirement facility. (Doc. No. 1-1, p. 3–8).

Defendant's 227-acre retirement community offers residents a range of living options that vary based on the level of care the resident requires. (Doc. No. 17-2, p. 1). Plaintiff, who is a Licensed Practical Nurse ("**LPN**"), began working for Defendants in February 2019 when she was assigned to the Asbury Health and Rehabilitation Center ("**Asbury**"). (Doc. No. 16, p. 1–2; Doc.

---

[1] The background set forth herein is taken from a combination of the parties' briefing and attached exhibits. The background is taken in the light most favorable to Plaintiff as the nonmoving party.

1

No. 1-1, p. 3).  Plaintiff was responsible for providing certain care-related activities, both routine and medical, some of which were more physically demanding than others.  (Doc. No. 17-2, p. 6–9).  Asbury is divided into six Household Units, numbered one through six, and Plaintiff predominantly worked in Units 3, 4, and 6.  (Doc. No. 17-1, p. 41–42).  The patients in these households are not considered independent but all required similar levels of care.  (Id.).

On April 27, 2020, Defendant alerted its residents and staff that a patient living in Unit 3 tested positive for COVID, (Doc. No. 18-2, p. 9).  Then, on May 4, Plaintiff consulted with her primary care physician, Dr. Jill Rabassa, because she was experiencing body aches and a headache. (Doc. No. 1-1, p. 10–11; Doc. No. 17-1, p. 83).  The following day, Plaintiff submitted to Defendants two notes from Dr. Rabassa. The first merely states that Plaintiff "was seen . . . on 5/4/2020. She may return to work on 5/11/2020."  (Doc. No. 1-1, p. 10).  The second declares: "Due to high risk medical condition, I have recommended to patient that she not work with Covid 19 clients."  (Id. at 11).  These notes do not give any further information.  Plaintiff stated that following her appointment with Dr. Rabassa, she was treated, released, "and given some days off." (Doc. No. 17-1, p. 83).  On approximately May 8, Plaintiff met with Elyse Piscitelli ("**Piscitelli**"), Defendant's Director of Nursing, and Brooke Hodge ("**Hodge**"), Defendant's Director of Health Services, to discuss the two notes from Dr. Rabassa.  (Doc. No. 17-1, p. 92–93).  During this meeting, Defendants requested additional information regarding Plaintiff's medical conditions. (Id. at 93–94.).[2]  In response, Plaintiff gave Hodge a third note from Dr. Rabassa, dated May 11, which stated without providing anything further: "Due to [the] underlying medical condition, I

---

[2] While Plaintiff contends Hodge "demanded that Plaintiff obtain a release letter from her doctor to work on household unit 3 or she should resign,"  (Doc. No. 18, p. 2), Defendants allege they instead simply asked Plaintiff "to provide more details regarding her purported disability" and provided her temporary leave—as directed by Dr. Rabassa—in the meantime, (Doc. No. 16, p. 5).  The Court addresses these assertions below.

2

have recommended that patient not work directly with Covid 19 patients during the pandemic, as I do consider her higher risk for complications from Covid 19 infection." (Doc. No. 1-1, p. 12). Plaintiff contends that on May 13, Defendant asked Plaintiff to work in Unit 3 even though there were COVID patients being treated therein. (Id. at 4).

On May 15, Plaintiff sent a letter to Kathlene Hendrick ("**Hendrick**"), Defendant's Chief Human Resource Officer, wherein Plaintiff resubmitted the notes from Dr. Rabassa, which "speak to [her] inability to work on the COVID designated unit due to [her] pre-existing health conditions." (Id. at 13). On May 22, Plaintiff met with Hendrick and Piscitelli; during this meeting, Plaintiff explained that she was willing to work if she could do so in household units that did not have COVID cases and if she did not otherwise have direct contact with COVID patients. (Doc. No. 18-2, p. 5; Doc. No. 17-1, p. 111). Hendrick requested additional information on Plaintiff's underlying medical conditions and provided her with an envelope containing her job description to give to her doctor to allow her doctor to determine which duties Plaintiff would be able to perform. (Doc. No. 16, p. 6; Doc. No. 18, p. 4) (see also Doc. No. 18-2, p. 5). Plaintiff was not on the schedule to work for the week of May 23 through May 31. (Doc. No. 18, p. 4).

On June 2, Plaintiff personally delivered a second letter requesting reasonable accommodations to Hodge, Hendrick, and Piscitelli. (Doc. No. 1-1, p. 14). On June 5, Hendrick sent Plaintiff a text message to try to put her back on the schedule since there were no more COVID cases at that time, but on June 10, Hendrick called Plaintiff to inform her that there were new COVID cases, and that she would remain on leave until her next scheduled shift, June 12. (Doc. No. 18-2, p. 6–7). However, on June 12, Plaintiff saw an orthopedic doctor for knee pain unrelated to her underlying issues at issue in this matter, and the orthopedic doctor excused Plaintiff from

3

work from June 12 through June 22. (Doc. No. 17-1, p. 113–117). Plaintiff delivered this letter to Defendant that same day. Id. This letter states in full: "It is my medical opinion that Mary Kumagah may return to work on 6/22/2020. If you have any questions or concerns, please don't hesitate to call." (Doc. No. 17-2, p. 10). After handing the letter to a supervisor, Plaintiff did not discuss it with Defendants further, nor did she provide any information about the reason for her need for additional leave. (Doc. No. 17-1, p. 116–17). Following this interaction, Plaintiff did not set foot on Defendant's residential community, nor did she call, email, or otherwise attempt to communicate with Defendant, again. (Id. at 118–19). The delivery of her June 12 note requesting time off was Plaintiff's final affirmative interaction with Defendant.

Defendant removed Plaintiff from its shift scheduling software on July 6. (Doc. No. 17-2, p. 11). In November 2020, Piscitelli began processing employee open enrollment benefits, and upon learning that Plaintiff remained in the employee roster despite having considered her to no longer be employed by Defendant as of July 6. (Id. at 4). Piscitelli thus processed and mailed Plaintiff her termination notice in November 2020, per Defendant's policies. (Id.)

During her employment with Defendant—from 2019 through 2020, Plaintiff was also employed in a similar capacity by other retirement communities, including The Haven from 2014 through 2021, and ACTS beginning in June 2020. (Doc. No. 17-1, p. 19–21).

On July 21, 2020, Plaintiff filed her charge with the Equal Employment Opportunity Commission ("**EEOC**"). (Doc. No. 1-1, p. 15–17).[3] Plaintiff then filed her Complaint in the Mecklenburg County Superior Court on December 17, 2021. (Doc. No. 1-1). Defendants removed the case to this Court on January 27, 2022. (Doc. No. 1). Plaintiff's Complaint alleges one claim

---

[3] The EEOC dismissed her action, stating that it would not proceed further with its investigation and made no determination on the merits of Plaintiff's claims, on September 20, 2021. (Doc. No. 1-1, p. 17).

for relief—that Defendant violated the ADA. (Doc. No. 1-1, p. 6). Defendant moved for summary judgment on November 10, 2022, (Doc. Nos. 15–16), Plaintiff filed her Memorandum in Opposition on November 28, 2022, (Doc. No. 18), and Defendant filed its Reply on December 2, 2012, (Doc. No. 19). Accordingly, Defendants' Motion is ripe for ruling.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

5

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Id. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. Id. at 249-50. In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." Id. at 252.

### III.  ANALYSIS

Plaintiff's sole claim for relief—that Defendant violated the ADA—raises three distinct allegations: (1) failure to accommodate, (2) discriminatory discharge, and (3) retaliatory discharge.[4]

The Americans with Disabilities Act ("**ADA**") prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA further

---

[4] While the Complaint asserts only one Claim for Relief, (Doc. No. 1-1, p. 6), for clarity purposes, the Court treats Plaintiff's three separate allegations falling within the ADA—reasonable accommodations, discriminatory discharge, and retaliatory discharge—throughout this Opinion as three individual claims.

6

prohibits employers from retaliating against an employee who has engaged in a protected ADA activity.  Id. § 12203(a).

## A.    ADA Discrimination

In analyzing an ADA discrimination claim, "a plaintiff must first establish that he is a 'qualified individual with a disability'" under the provisions of the Act.  § 12112(a); see also Shin v. Univ. of Md. Med. Sys. Corp., 396 F. Appx. 472, 479 (4th Cir. 2010); Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 (4th Cir. 2004); Rhoads v. FDIC, 257 F.3d 373, 387 (4th Cir. 2001).  To that end, the ADA defines "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(9).  Therefore, to survive summary judgment on an ADA claim, a plaintiff must "produce evidence showing that [s]he is both qualified and disabled."  Shin, 369 F. Appx. At 479.  The parties do not dispute that Plaintiff was qualified for her position, but Defendant contends it is entitled to summary judgment because she was not disabled as defined by the ADA.

The ADA defines an individual with a disability as one with "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  In deciding whether an employee is disabled, courts interpret the ADA and its amendments broadly "in favor of expansive coverage, keeping in mind that the language is not meant to be a demanding standard," but the employee must meet the ADA's definition of disability at the time the employer took adverse action against her.  EEOC v. Loflin Fabrication, LLC, 462 F. Supp. 3d 586, 599–600 (M.D.N.C. 2020) (citation omitted).  A plaintiff bears the burden of

proof on this issue, and in doing so, it "is insufficient . . . to merely submit evidence of a medical diagnosis or impairment.  Instead, the ADA requires [the plaintiff] to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial."  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002) overruled on other grounds, U.S. Pub. L. 110-325 (2009).  This is because not every impairment constitutes an ADA disability.  Id.

Here, Plaintiff alleges she suffers from pre-existing health conditions, including high blood pressure, pulmonary sarcoidosis, and diabetes, and because of these conditions, she was at high risk of COVID complications.  (Doc. No. 18, p. 13).  As such, she obtained a written medical restriction precluding her from working directly with COVID patients.  (Doc. No. 1-1, p. 10) Conversely, Defendant contends that she cannot produce evidence that she is disabled as demonstrated by her reluctance to disclose the specifics of her alleged disability.  (Doc. No. 16, p. 14).  While the Court agrees with Defendant that Plaintiff's communications were certainly ambiguous, in viewing the evidence in the light most favorable to Plaintiff, the Court will assume without deciding that Plaintiff did suffer from a disability within the meaning of the ADA. Nevertheless, Plaintiff's claims for discrimination under the Act still fail on their merits.[5]

    1.    <u>Reasonable Accommodation</u>

One form of prohibited ADA discrimination is an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual

---

[5] Defendant asserts that a "non-impairing medical condition cannot be transformed into a disability by the risk posed by COVID-19."  (Doc. No. 16, p. 13–14).  In support, Defendant cites both guidance from the EEOC and case law from a number of courts that have addressed this issue.  However, the Fourth Circuit has not ruled on this issue.  For the reasons outlined below, the Court finds that Defendant is entitled to summary judgment on other grounds, and as such, the Court declines to address this specific argument.

with a disability who is an . . . employee." 42 U.S.C. § 12112(b)(5)(A). As defined by the ADA, "reasonable accommodations" can include "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . appropriate adjustment or modifications of . . . policies, . . . and other similar accommodations. . . ." Id. § 12111(9). To establish a *prima facie* claim for failure to accommodate, a plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." Wilson v. Dollar General Corp., 717 F.3d 337, 345 (4th Cir. 2013) (quoting Rhoads, 257 F.3d at 387 n.11). Here, even assuming Plaintiff can satisfy the first element of a *prima facie* failure-to-accommodate claim, the parties dispute whether she is able to satisfy the additional elements.

The second element requires that Defendant had notice of her disability. Plaintiff contends her letters from Dr. Rabassa make clear that she was at an increased risk of having COVID complications because of her underlying medical conditions, and that she was medically restricted from working directly with COVID patients at Defendant's facility. (Doc. No. 18, p. 13). Defendant contends her communications referred only to a "vague" medical condition, and that her failure to provide notice of her disability precluded Defendant from being able to respond to her requests for reasonable accommodation. However, Plaintiff's "burden to provide notice is not an onerous one: the employee . . . need only inform the employer of *both* the disability and the employee's need for accommodations for that disability." Schneider v. Giant of Md., LLC, 389 Fed. Appx. 263, 270 (4th Cir. 2010) (citing EEOC v. Fed. Express Corp., 513 F.3d 360, 369 n.5

(4th Cir. 2001)).  Though the Court agrees with Defendant that Plaintiff's communications concerning her medical conditions were indeed vague,[6] it finds that Plaintiff satisfied the low burden of the notice element of her failure-to-accommodate claim because at the very least, her letters from doctors and her letters to Hendrick identify Plaintiff as having a disability—assuming, as above, that Plaintiff's underlying conditions and increased risk of COVID complications constitute an ADA disability—and her need for accommodations to allow her to continue to work without directly working with COVID patients.  See id.

The third element of Plaintiff's claim for failure to accommodate requires Plaintiff to prove that she would have been able to perform the essential functions of her position with reasonable accommodation.  "This inquiry proceeds in two steps.  First, was the specific accommodation requested by [the plaintiff] reasonable?  Second, had [the defendant] granted the accommodation, could [the plaintiff] have performed the essential functions of the position?"  Jacobs, 780 F.3d at 580 (citing Wilson, 717 F.3d at 345).  Here, Plaintiff cannot demonstrate either.

A reasonable accommodation under the ADA is one that "enables [a qualified] individual with a disability . . . to perform the essential functions of [the] position."  29 C.F.R. § 1630.2(o)(1)(ii).  However, an employer need not make "'substantial' or 'fundamental'" modifications, Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454, 464 (4th Cir. 2012) (quoting Alexander v. Choate, 469 U.S. 287, 300 (1985)), and a modification "is not reasonable if it either imposes undue financial and administrative burdens . . . or requires a fundamental

---

[6] Further, the Court notes that to the extent Defendant contends Plaintiff failed to provide anything more than "vague" references to her medical conditions in her communications with Defendant prior to the initiation of this action, (Doc. No. 16, p. 16–17), Plaintiff's own reference to her deposition testimony as specifically identifying her relevant COVID underlying conditions supports Defendant's assertion.

alteration in the nature of the program." Id. (quoting Sch. Bd. v. Arline, 480 U.S. 273, 287 n.17 (1987)). To survive summary judgment, the plaintiff must present evidence that would allow a jury to infer that the accommodation "is reasonable on its face, *i.e.*, ordinarily or in the run of cases." Id. (quoting U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401–02 (2002)). Based on the record, however, the specific accommodation Plaintiff requested is unreasonable, and even had it been granted, Plaintiff would not have been able to perform the essential functions of her job.

Plaintiff alleges she requested that she be allowed to continue to work in other household units that did not have COVID cases. (Doc. No. 18, p. 3). However, the Court does not find Dr. Rabassa's letters, or Plaintiff's additional communications with Defendant, as clear in terms of Plaintiff's requested accommodation as Plaintiff contends.[7] While she does expressly request working in household units other than Unit 3, the problems arise upon review of Plaintiff's doctor's notes. In Dr. Rabassa's three letters, she only establishes that Plaintiff must be placed on leave from May 4–12 for an unspecified reason and that because of a high risk medical condition Plaintiff was restricted from working with directly with COVID patients for as long as the pandemic lasted. (Doc. No. 1-1, p. 10–14). Plaintiff herself testified that when Dr. Rabassa issued her letter, nobody knew when the pandemic would end and that it still had not ended when she provided her testimony. (Doc. No. 17-1, p. 94–95). Further, Plaintiff also testified that in light of the possibility

---

[7] For example, the first May 4 letter does not reference a medical condition at all and instead just declares that Plaintiff cannot return to work until May 11, (Doc. No. 1-1, p. 10); the second generally states that "[d]ue to [a] high risk medical condition, I have recommended to patient that she not work with Covid 19 clients," (id. at 11); the May 11 letter states only that "[d]ue to the underlying medical condition, I have recommended that patient not work directly with Covid 19 patients during the pandemic, as I do consider her higher risk for complications from Covid 19 infection," (id. at 12); Plaintiff's May 15 letter only references her "pre-existing health conditions," (id. at 13); her June 2 letter to Defendant states the same, (id. at 14); and her June 12 letter simply concludes that she cannot work until after June 22, without referencing a medical condition at all, (Doc. No. 17-2, p. 10). Importantly, none of these communications indicate how her unspecified but "high risk" and "underlying" medical conditions impacted her ability to perform her job.

11

of an asymptomatic patient testing positive for COVID, Defendants could not guarantee she would not work directly with COVID patients regardless of what household unit she was placed in. (Id. at 72–73). Thus, given the nature of the accommodation requested (that Plaintiff work in household units other than Unit 3), the express restriction in Dr. Rabassa's May 11 letter (that Plaintiff could not work directly with COVID patients), and the nature of COVID itself (namely, that it was essentially impossible to guarantee Plaintiff would not work directly with COVID patients), Plaintiff's requested accommodation was a broad one. Ultimately, Plaintiff requested that she be allowed to work, but that she be restricted from working with COVID patients—who could be asymptomatic and thus unknowable. The Court finds that such a request is unreasonable on its face because it is seemingly impossible for Defendant to have complied with, and further, doing so would have imposed an undue administrative burden by requiring Defendant to transfer Plaintiff off any COVID-positive patient's case and out of any household unit treating COVID patients. See Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 414 (4th Cir. 2015) ("A reasonable accommodation is one that is feasible or plausible."))

Even if Plaintiff's request had been granted such that she continued to work in Units 1, 2, 4, 5, and 6, but she did not have to work directly with COVID patients, she would not have been able to perform the essential functions of her job. Six of the twelve "Essential Duties and Responsibilities" outlined in Plaintiff's job description require direct contact with patients. (Doc. No. 17-2, p. 6–7). These responsibilities include routine patient care, more complex care after adequate instruction, observing and assessing patients' conditions, implementing specific patient care plans, communicating with residents, and maintaining positive working relationships with residents. (Id.). Plaintiff testified that her duties included giving patients their medications, seeing

12

to their well-being, reporting on patients' conditions to the doctors and their families, feeding them, changing bandages, and other similar activities. (Doc. No. 17-1, p. 42–44). In Plaintiff's own words, then, these all require direct contact with patients, any of whom could have been asymptomatic but COVID-positive. The Court fails to see how Plaintiff would have been able to perform the essential functions of her job had Defendant granted her request in full. And even if the Court had found otherwise, Plaintiff's claim still fails on the fourth element.

The final element required for a failure-to-accommodate claim requires Plaintiff to demonstrate that Defendant refused her request for a reasonable accommodation. Plaintiff contends Defendant failed to engage in the required interactive process in good faith to identify a reasonable accommodation. The Act provides that to "determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o). Plaintiff correctly states that the duty to engage in this interactive process "is triggered when an employee communicates her disability and desire for an accommodation—even if the employee fails to identify a specific, reasonable accommodation." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 581 (4th Cir. 2015). Here, viewing the evidence in her favor, that would have been when Plaintiff submitted Dr. Rabassa's letters. However, Plaintiff incorrectly concludes that Defendant acted in bad faith by failing to engage in the interactive process as required. Rather, the record and her own testimony demonstrates that this argument is without merit.

13

Plaintiff contends that Defendant acted in bad faith by: (1) informing her that "it was impossible to guarantee a household wouldn't have COVID-19 patients" and demanding she obtain a release from her doctor before she would be allowed to return to work; (2) threatening that she either obtained a full medical release or resigned from her position; (3) concluding it could not accommodate Plaintiff, despite her medical restriction being "clear on its face" that it only restricted her from working directly with known or confirmed COVID patients; and (4) attempting to intimidate her by informing Plaintiff that Defendant had consulted with a lawyer concerning her request. (Doc. No. 18, p. 9–10). Plaintiff's first and fourth contentions do not indicate bad faith on Defendant's part. Defendant was honest to Plaintiff about its ability to comply with her request to avoid working with COVID patients, and in light of Dr. Rabassa's directive that she not work with any COVID patients for the length of the pandemic, it was reasonable for Defendant to seek further direction on how to allow Plaintiff to return to work. Additionally, merely consulting with a lawyer does not demonstrate an intent to intimidate, but rather an attempt to comply with the ADA in coming to a solution for Plaintiff's request. Further, as explained above, Plaintiff's medical restriction was anything but "clear on its face"—it referenced unspecified medical conditions and simply that Plaintiff could not work with COVID patients. Without additional information on Plaintiff's underlying conditions, and with such a broad directive at the height of the COVID pandemic, the Court does not see how Defendant was expected to know how to accommodate Plaintiff's request. Plaintiff does not present any evidence demonstrating that she more clearly expressed that contrary to her doctor's broad restriction, she was willing to continue to work as long as she could do so in units other than Unit 3 and without having to work directly with COVID patients, until her May 13 meeting with Defendant. (Doc. No. 18-2, p. 3).

14

Finally, Plaintiff argues Defendants took no steps that demonstrate their good-faith participation. (Id.). To the contrary, Defendant produced ample evidence of its intent to participate in this informal interactive process: the parties were in communication concerning Plaintiff's request from May 5 through June 12, and between May 8–22, the parties met twice, wherein Defendant requested additional information from Plaintiff's doctor regarding her specific conditions and the job-specific responsibilities she would and would not be able to perform so as to be able to provide her with reasonable accommodations. (Doc. No. 17-1, p. 93–94; Doc. No. 17-2, p. 3; Doc. No. 17-4, p. 2). Plaintiff's own testimony supports Defendant's position. (Doc. No. 17-2, p. 112; Doc. No. 1-1, p. 13; Doc. No. 18-2, p. 5–7). Instead, the Court agrees with Defendant that Plaintiff "utterly failed in [her] duties under the ADA and never provided [Defendant] with adequate understanding of [her] precise physical limitation and what accommodations it could take in light of these limitations." Allen v. City of Raleigh, 140 F. Supp. 3d 470, 490 (E.D.N.C. 2015). Despite repeated requests for further information through meetings, phone calls, updates and attempts to schedule Plaintiff through June 12, Plaintiff refused to provide Defendant with the additional details it requested that would have allowed it to provide reasonable accommodation. (Doc. No. 18-2).

As such, Plaintiff has failed to produce evidence demonstrating Defendant refused to participate in good faith in an interactive process. Rather, Plaintiff herself failed to participate in good faith in that she refused to identify the precise limitations caused by her alleged disability, and the accommodation she requested was in and of itself not reasonable. Defendant contends, and Plaintiff does not dispute, that it never received any medical documentation from Plaintiff or her doctors indicating that her original restriction—outlined in the May 11 note wherein Dr.

Rabassa, which stated: "Due to [the] underlying medical condition, I have recommended that patient not work directly with Covid 19 patients during the pandemic, as I do consider her higher risk for complications from Covid 19 infection," (Doc. No. 1-1, p. 12)—had been lifted.

Second, Plaintiff contends that Defendant instead simply refused Plaintiff's request for accommodations. However, the record indicates Defendant attempted to comply with Plaintiff's vague requests in that it provided her with leave when she requested it, (Doc. No. 17-1, p. 83, 113–17), and that Defendant attempted to put Plaintiff back on the schedule on June 6 because there were no COVID cases at that time. (Doc. No. 18-2, p. 6–7). After a new COVID case arose, on June 10 Hendrick called Plaintiff to inform her that that she would remain on leave until her next scheduled shift, which was for June 12. (Id.). However, on June 12, Plaintiff again requested leave for an unrelated condition—and as neither the doctor's letter nor Plaintiff indicated it was not related to her ADA request, Defendant could not have known this at that time—through June 22. (Doc. No. 17-1, p. 113–117). Thus, Plaintiff's argument is without merit.[8] Here, Defendant did not obstruct the interactive process, "but instead ma[de] reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed." Allen, 140 F. Supp. 3d at 490 (citing Beck v. Univ. of Wis. Bd. Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)).

---

[8] In addition, the Court notes that the record indicates that while Plaintiff was on leave with Defendant—from May 4 through May 11—Plaintiff was still able to work for over forty hours for The Haven. (Doc. No. 17-3, p. 12). Similarly, following her June 12 request for leave for her knee injury, Plaintiff worked for over forty hours from June 14 through June 20. (Id. at 14). Further, Plaintiff testified that she did not provide The Haven with any of her doctor's notes, nor did she request reasonable accommodations for her underlying medical conditions and increased risk of COVID from any employer other than Defendant. (Doc. No. 17-1, p. 86–87). And despite a reported COVID outbreak at ACTS in August, 2020, Plaintiff never requested reasonable accommodations from ACTS to restrict her from working with COVID patients as she did with Defendant. (Id. at 92). Instead, she indicated to The Haven that she did not have a disability, (Doc. No. 17-3, p. 19), and to ACTS that she did not need accommodations for environmental conditions, including infectious diseases, (Doc. No. 17-3, p. 3).

16

Defendant has provided ample evidence that Plaintiff refused to provide the necessary information that would have permitted them to accommodate her alleged disability, and Plaintiff has not provided evidence to create a genuine issue of material fact as to her entitlement to reasonable accommodations other than her own pleadings and affidavit, which as explained above, directly conflict with the evidence she does provide. However, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Cor., 736 F.2d 946, 960 (4th Cir. 1984) (citing Radobenko v. Automated Equip. Co., 520 F.2d 540, 544 (9th Cir. 1975)).

Therefore, the Court holds that because there is no genuine issue of material fact, and Plaintiff has not presented evidence from which a jury could return a verdict in her favor, Defendant is entitled to summary judgment as to Plaintiff's claim that Defendant failed to accommodate her reasonable request for accommodations in violation of the ADA.

2. Wrongful Discharge

Plaintiff next asserts that Defendant wrongfully discharged her in violation of the ADA. Defendant moves for summary judgment on this claim because they contend Plaintiff was not terminated, but that she instead abandoned her job.

To establish a *prima facie* ADA discrimination claim for wrongful discharge, a plaintiff must "provide evidence sufficient to demonstrate that (1) he 'was a qualified individual with a disability'; (2) he was discharged; (3) he 'was fulfilling his employer's legitimate expectations at the time of discharge'; and (4) 'the circumstances of his discharge raise a reasonable inference of unlawful discrimination.'" Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quoting Rohan v. Networks Presentations, LLC, 375 F.3d 266, 277 n.9 (4th Cir. 2004)). If the

17

plaintiff successfully does so, the defendant will then have the burden of producing evidence of a legitimate, non-discriminatory reason for the plaintiff's termination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Finally, the burden will then shift back to the plaintiff to demonstrate that the defendant's justification was instead merely pretext. Id. at 804.

For the same reasons outlined in the previous section of this Order, the Court assumes without deciding that Plaintiff satisfies the first element of her wrongful termination claim. However, Plaintiff's claim fails at the second element because she cannot demonstrate that she was terminated.

Defendant asserts, and Plaintiff does not dispute, that its policy on abandonment stated:

If you are absent on a regularly scheduled work day, it is your responsibility to contact the supervisor every day that you are out, unless the absence is part of an approved leave of absence. If you are out more than two consecutive workdays without notification, you will be considered as a no call/no show and will be terminated due to job abandonment/voluntary quit.

(Doc. No. 17-2, p. 13). Defendant contends that after receiving her request for leave from June 12–22, (Doc. No. 17-2, p. 10), Plaintiff did not inquire about her schedule; in fact, after delivering her request for leave on June 12, Plaintiff never called, emailed, or otherwise contacted Defendant again before filing this action. (Doc. No. 17-1, p. 118–19). Thus, Plaintiff's own acts demonstrate that she abandoned her employment with Defendant—she consistently requested leave for the days she was scheduled to work. Plaintiff's asserted timeline demonstrates that: Plaintiff requested, and was granted, leave from May 5–12; Plaintiff was asked to work on May 13 but declined because Defendant asked her to work in Unit 3, where there was a COVID outbreak; and Plaintiff was removed from the schedule from May 15–31. (Doc. No. 18, p. 4, 18–19). The record further shows Defendant attempted to schedule Plaintiff to work twice—on June

18

6 and June 12. (Doc. No. 18-2, p. 6-7).[9] Thus, after not hearing from Plaintiff after she was medically cleared to return, Defendant reasonably concluded she abandoned her job and removed her from its shift scheduling software on July 6.[10] See Marshall v. AT&T Mobility, 793 F. Supp. 2d 761, 764 (D.S.C. 2011) (holding that the employee failed to establish a *prima facie* case of wrongful discharge under the ADA because the evidence demonstrated he abandoned his job).

Therefore, even viewing the evidence in the light most favorable to Plaintiff and establishing the timeline above solely off Plaintiff's own pleadings, evidence, and testimony, the Court finds that Plaintiff abandoned her employment with Defendant and as such, Defendant did not terminate Plaintiff. Plaintiff thus fails to demonstrate the second element of a *prima facie* claim for wrongful discharge under the ADA, requiring that Defendant took adverse employment action against her.[11] Accordingly, the Court holds Defendant is entitled to summary judgment on Plaintiff's claim under the ADA for discriminatory discharge.

**B.      ADA Retaliation**

Plaintiff's final claim under the ADA asserts Defendant terminated her in retaliation for having filed an EEOC Charge. The ADA establishes that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this

---

[9] In her Complaint Plaintiff alleged that she was scheduled to work after June 5, and in her EEOC Charge, Plaintiff stated, "On June 11, 2020, a day prior to my scheduled shift, HR called me informing me that there were two new cases of COVID19 and asked if I was still willing to work." (Doc. No. 1-1, p. 6, 16).

[10] The Court further notes that while not determinative, Plaintiff does not dispute Defendant's allegation that she began working for ACTS, in the same capacity as her role with Defendant, just four days after her June 22 medical restriction ended. (Doc. No. 16, p. 8). Though Defendant was not aware of this information at the time, it tends to support Defendant's abandonment theory.

[11] Defendant also argues it is entitled to summary judgment because Plaintiff cannot show she was fulfilling her employer's legitimate expectations at the time of her termination, nor can she show either discriminatory animus or temporal proximity. Though not reaching the issue, the Court notes that the record indicates Plaintiff repeatedly requested time off when she was scheduled to work, and as Defendant contends, "[a] regular and reliable level of attendance is a necessary element of most jobs." Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 312 (4th Cir. 1994). Further, for the reasons discussed below, the Court notes Plaintiff has not provided any evidence of discriminatory animus, nor does she demonstrate proximity between her purported termination and her medical disclosure.

19

chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 12203(a). Thus, a plaintiff asserting an ADA retaliation claim must "either offer sufficient direct and indirect evidence of retaliation[] or proceed under a burden-shifting method." Rhoads, 257 F.3d 373, 391 (4th Cir. 2001) (citation omitted). Under the first method, a plaintiff will only survive summary judgment if he "produce[s] direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Id. (citation and quotation omitted). Under the burden-shifting method, a plaintiff must first establish a *prima facie* case of retaliation by showing that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Reynolds, 701 F.3d at 154 (citation omitted). The burden will then shift to the employer to show its legitimate, non-retaliatory reasons for its actions. Rhoads, 257 F.3d at 392. Finally, the plaintiff must then establish that those reasons are mere pretext for impermissible retaliation. Id.

Defendant moves for summary judgment on this claim for three reasons: (1) because Plaintiff did not indicate a retaliation claim on her EEOC Charge, it should be dismissed for Plaintiff's failure to exhaust her remedies; (2) Plaintiff's claim fails on the merits because she did not suffer adverse activity; and (3) Plaintiff cannot show a causal link.

"An employee seeking redress for discrimination cannot file suit until she exhausted the administrative process." Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 407 (4th Cir. 2013) (citing 42 U.S.C. § 2000e–5(b)). However, this requirement "is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." Id. (quoting Chacko v. Patuxent Indus., 429 F.3d 505, 510 (4th Cir. 2005)). This is especially true considering

20

that in "any subsequent lawsuit alleging unlawful employment practices under Title VII, a federal court may only consider those allegations included in the EEOC charge."  Id. (citing Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962–63 (4th Cir. 1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.")).  However, courts construe EEOC charges liberally.  Id. (quoting Alvarado v. Bd. of Trs. Montgomery Cmty. Coll., 848 F.2d 457, 460 (4th Cir. 1988)).

Here, Defendant argues that because Plaintiff did not mark the box for "retaliation" or otherwise indicate such a claim on her EEOC Charge, her retaliation claim should be dismissed. However, the Court agrees with Plaintiff that her failure to check the "retaliation" box is not fatal to her claim.  On her EEOC Charge, Plaintiff alleged: "On May 15, . . . I was told that I needed to get a full release from my doctor and if I could not be fully released, I would need to resign. . . . I was ultimately taken off the schedule after I submitted my last doctor's note."  (Doc. No. 1-1, p. 15).  While this allegation does not mention retaliation or termination, it generally alleges that she was terminated because she failed to get a doctor's release.   Accordingly, the Court rejects Defendant's request to dismiss her claim for this reason and turns to the merits of Plaintiff's claim.

The parties do not dispute that Plaintiff engaged in protected conduct by filing her EEOC Charge.  However, Defendant argues it is entitled to summary judgment because Plaintiff cannot demonstrate she suffered from adverse employment action, nor can she satisfy the causation requirement for her claim.  For the reasons discussed above, the Court has already determined that Plaintiff abandoned her job and thus cannot demonstrate that she suffered an adverse employment action by being terminated.  However, even if Plaintiff had demonstrated that she was terminated,

thereby satisfying the second element of a retaliation claim, she cannot satisfy the requirement that a causal link exists between filing her EEOC charge and her termination.

For the third element, "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity. Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). Plaintiff alleged she was terminated after Defendant responded to her EEOC Charge.[12]  (Doc. No. 1-1, p. 6). However, the record indisputably indicates that Plaintiff filed her EEOC Charge on July 21, 2020, (Doc. No. 1-1, p. 15), and Plaintiff does not provide any evidence to dispute Defendant's assertion that it removed Plaintiff from its scheduling software on July 6. At that time, as explained above, Defendant reasonably believed she had abandoned her employment. Though Plaintiff attempts to create a genuine issue of material fact as to her actual termination date, she fails to do so for the reasons stated in Defendant's Reply. (Doc. No. 19, p. 8). Because the record demonstrates Defendant removed Plaintiff from its employee software on July 6, it could not have done so in retaliation for an EEOC Charge Plaintiff did not even file until July 21. Therefore, Plaintiff fails to establish a *prima facie* case of retaliatory termination. Accordingly, the Court holds Defendant is entitled to summary judgment as a matter of law on Plaintiff's claim for ADA retaliatory termination.

---

[12] Plaintiff's Response raises a new theory for her retaliation claim in that rather than asserting Defendant retaliated against her for filing her EEOC Charge, Plaintiff's Response contends that Defendant retaliated against her for requesting reasonable accommodation in violation of the ADA. However, the Fourth Circuit has held that "it is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint." U.S. ex rel. Owens v. First Kuwaiti General Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). While the Court does not reach the issue, it notes that based on the record, Plaintiff has not provided evidence that she opposed any act made unlawful by the ADA outside of her EEOC Charge. Her communications reflect her requests for reasonable accommodation, but not that she believed any of Defendant's actions had violated the ADA at that time.

**C.    Rule 12(b)(6) of the Federal Rules of Civil Procedure**

Defendant additionally argues it is entitled to summary judgment because Plaintiff's complaint fails to state a claim on which relief may be granted.  This is so, Defendant claims, because an ADA claim must identify the disability in the complaint, and Plaintiff's Complaint fails to identify both her alleged disability and that her disability limited any major life activities. However, because the Court finds Defendant is entitled to summary judgment as to Plaintiff's claims on other grounds, the Court does not reach this issue.

Therefore, because Plaintiff has failed to demonstrate that a genuine dispute as to material fact exists for any of the claims she alleges under the ADA, the Court holds Defendant is entitled to judgment as a matter of law.

## IV.    <u>CONCLUSION</u>

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment, (Doc. No. 15), is GRANTED.

IT IS SO ORDERED.

Signed: December 23, 2022

Frank D. Whitney
United States District Judge